**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL P.; ELIZABETH G., as
Guardian Ad Litems of Courtney
G., an incompetent minor;
COURTNEY G., an incompetent
minor,
              *Plaintiffs-Appellants,*

          v.

DEPARTMENT OF EDUCATION,
STATE OF HAWAII,
              *Defendant-Appellee.*

No. 09-16078

D.C. No.
1:08-cv-00146-
HG-BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, Senior District Judge, Presiding

Argued and Submitted
June 18, 2010—Honolulu, Hawaii

Filed September 8, 2011

Before: Betty B. Fletcher, Harry Pregerson, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Clifton

17023

**COUNSEL**

Carl M. Varady, Honolulu, Hawaii, for the plaintiffs-appellants.

Rebecca A. Copeland, Department of Education, State of Hawaii, Honolulu, Hawaii, for the defendant-appellee.

**OPINION**

PREGERSON, Circuit Judge:

Courtney G., a minor with dyslexia, by and through her mother and Guardian Ad Litem, Elizabeth G.,[1] appeals from the district court's order affirming the Administrative Hearings Officer's ("Hearing Officer") conclusion that the Hawaii Department of Education ("Hawaii DOE") properly found Courtney ineligible for services under the Individuals with Disabilities Education Act ("IDEA"). Hawaii DOE determined that Courtney did not qualify for special education under the "specific learning disability" classification because

---

[1]Courtney's grandfather, Michael P., filed a complaint individually and as Guardian ad Litem of Courtney, appealing the Hearing Officer's decision. The district court granted leave to amend the complaint to substitute Courtney's mother as Guardian. The district court ultimately dismissed Michael P. from the lawsuit for lack of standing. This determination is not at issue on appeal.

she could not demonstrate a "severe discrepancy" between her actual achievement and her intellectual capacity. Both the Hearing Officer and the district court rejected Courtney's argument that Hawaii DOE violated IDEA by relying exclusively on the "severe discrepancy model" to determine whether she had a "specific learning disability." We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand.

## BACKGROUND

### A.   Statutory Background

"Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided a free appropriate public education which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected." *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491 (2009) (internal marks omitted) (citing *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 367 (1985)). To qualify for services under IDEA, a child must show (1) the existence of one or more disability classifications, and (2) a need for special education. 20 U.S.C. § 1401(3)(A).

To establish eligibility under the "specific learning disability" classification, a student must show that she (1) has "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to . . . read, write, spell, or to do mathematical calculations, including conditions such as . . . dyslexia," 34 C.F.R. § 300.8(c)(10)(i); and (2) she needs special education. 20 U.S.C. § § 1401(3)(A), 1401(30)(A). For many years, federal regulations required students to demonstrate their need for special education under the "specific learning disability" classification by showing a "severe discrepancy" between actual achievement and intellectual ability. *See* Dixie Snow Huefner,

*The Final Regulations for the Individuals with Disabilities Education Improvement Act (IDEA '04)*, 217 Ed. Law Rep. 1, 8-9 (2007); *see also* Mark C. Weber, *The IDEA Eligibility Mess*, 57 Buff. L. Rev. 83, 123-24 (2009).

The federal regulations did not define "severe discrepancy," but rather, left the matter to the discretion of each state. Perry A. Zirkel, *The Legal Meaning of Specific Learning Disability for Special Education Eligibility*, 28 (2006). Hawaii defined a "severe discrepancy" as a 1.5 standard deviation between actual achievement and intellectual ability scores. Haw. Code R. § 8-56-26(b) (repealed Nov. 23, 2009). Alternatively, if standardized tests were invalid or did not reveal a statistically significant deviation, Hawaii permitted consideration of additional evidence to determine whether a "severe discrepancy" existed, such as work samples and information provided by the parent. Haw. Code R. § 8-56-26(b) (repealed Nov. 23, 2009).

Over the last decade, scientific research has established that the "severe discrepancy model" is not necessarily a good indicator of whether a child has a learning disability. *See* Weber, *supra* at 123-27; H.R. Rep. No. 108-77 at 112 (2003). The "severe discrepancy model" is based on the premise that underperforming students with relatively high IQs must have a learning disability, whereas underperforming students with low IQs are just "slow." *See* Suzanne Wilhelm, *Accommodating Mental Disabilities in Higher Education: A Practical Guide to ADA Requirements*, 32 J.L. & Educ. 217 (2003). This premise is subject to dispute because intelligence testing is not the best indicator of academic potential. *See* Susan E. McGuigan, *Documenting Learning Disabilities: Law Schools' Responsibility to Set Clear Guidelines*, 36 J.C. & U.L. 191, 196. As a result, reliance on the "severe discrepancy model" tends to under-identify children with below average intelligence. *Id.* Moreover, education experts have criticized the model as unreliable, invalid, easily undermined, and harmful because it delays early treatment. *See* Weber, *supra* at 124.

To address these growing concerns, Congress eliminated the "severe discrepancy" requirement when it reauthorized IDEA in 2004. *See* 20 U.S.C. § 1414(b)(6)(A) ("[W]hen determining whether a child has a specific learning disability . . . , a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability in oral expression, listening comprehension, written expression, basic reading skill, reading comprehension, mathematical calculation, or mathematical reasoning."); *see also* H.R. Rep. No. 108-77 at 112 (2003) (indicating that Congress is "discouraged by the widespread reliance on the IQ-achievement discrepancy model that serves as the determining factor of whether a child has a specific learning disability").

Although the amended statute does not require school districts to use an alternative model to determine whether a student has a "specific learning disability," it expressly permits use of the "response to intervention model." *See* 20 U.S.C. § 1414(b)(6)(B) ("In determining whether a child has a specific learning disability, a local educational agency may use a process that determines if the child responds to scientific, research-based intervention . . . "). Moreover, legislative history endorses this model. *See* H.R. Rep. No. 108-77, at 107 ("The Committee is greatly encouraged by the growing use of alternative measures that are being used in place of the IQ-achievement discrepancy model [including the 'response to intervention model'].").

The premise underlying the "response to intervention model" is that "a majority of students can learn if effective instruction is provided." Nicholas L. Townsend, *Framing a Ceiling as a Floor: The Changing Definition of Learning Disabilities and the Conflicting Trends in Legislation Affecting Learning Disabled Students*, 40 Creighton L. Rev. 229, 259 (2007). A student who does not progress adequately after exposure to increasingly intensive and individualized instruction is deemed eligible for special education. *See id.*; *see also*

Weber, *supra* 128. "Thus, the definition of disability and the identification of learning disabled students become linked to instruction." Townsend, *supra* at 259. Many experts favor the "response to intervention model" because it identifies students with a "specific learning disability" before academic failure occurs, whereas the "severe discrepancy model" takes a "wait to fail" approach. *See* Weber, *supra* at 131-33; H.R. Rep. No. 108-77, at 112 (2003).

The United States Department of Education issued regulations implementing the 2004 amendments to IDEA on August 14, 2006, which became effective on October 13, 2006. *See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities*, 71 Fed. Reg. 46540, 46786 (Aug. 14, 2006) (to be codified at 34 C.F.R. § § 300.307). The amended regulations provide that an evaluation team may find a child eligible for special education under the "specific learning disability" classification if the child demonstrates (1) inadequate achievement relative to age or grade level standards; *and* (2) insufficient progress after intervention, *or* a pattern of strengths and weaknesses in achievement relative to age, grade-level standards, or intellectual development, which indicates a "specific learning disability."[2] *See* 34 C.F.R. § 300.309(a); *see also* Huefner, *supra* at 10-11. The regulations prohibit states from requiring school districts to use the "severe discrepancy model" and compel states to allow school districts to use the "response to intervention model." *See* 34 C.F.R. § 300.307(a)(1).

Hawaii DOE did not conform its regulations to federal law until November 23, 2009—more than three years after the federal regulations took effect. These new regulations permit

---

[2]These regulations incorporate the "response to intervention model" as a possible way to identify a child eligible for special education under the "specific learning disability" classification.

a student to qualify for special education absent a "severe discrepancy" between actual achievement and intellectual ability.[3]

## B.  Factual Background

From the second grade in 2003 until the beginning of the sixth grade in 2007, Courtney attended a public elementary school in Hawaii. During this period, Courtney struggled with reading and consistently read below grade level on both standardized and informal reading tests. From the second through the fourth grade, Courtney was placed in the "at risk" category according to a standardized literacy test. Despite daily reading practice at home with her grandfather, small group reading intervention at school, and private tutoring at her mother's expense, she still remained in the "at risk" category. By the middle of her fourth grade year, Courtney was 2.4 grade levels behind in reading.

### 1.  *Hawaii DOE Assessments*

Towards the end of Courtney's fourth grade year, Courtney's mother and grandfather requested a special education evaluation meeting with Hawaii DOE. At the meeting, Courtney's mother and grandfather requested that Hawaii DOE use the "response to intervention model" to determine whether Courtney had a "specific learning disability." Although Hawaii DOE agreed to an in-depth achievement evaluation of Courtney's abilities, Hawaii DOE refused to use the "response to intervention model."

Hawaii DOE's "in-depth achievement evaluation" con-

---

[3]The amended Hawaii regulation provides that an evaluation team may determine that a student has a "specific learning disability" if the student demonstrates (1) inadequate achievement *or* a severe discrepancy between intellectual ability and academic achievement, *and* (2) insufficient progress or a pattern of strengths and weaknesses relevant to identifying a "specific learning disability". *See* Haw. Code R. § 8-60-41(a).

sisted of a classroom reading assessment report, conducted by a special education resource teacher for the school district, and a formal academic assessment, conducted by a "psychological examiner." Both tests were conducted at the end of Courtney's fourth grade year. According to the classroom assessment report, "Courtney struggles as a reader, [is] able to decode at about the [third to fourth] grade level but comprehends at about the [second to third] grade level." The report also noted that Courtney needed to improve her oral fluency skills, which were at the second to third grade level. The formal academic assessment indicated that Courtney's overall academic performance was consistent with the "Average to Below Average" range, and that her weakest skills related to reading and math fluency.

## 2. *June 7, 2006, Eligibility Meeting*

At the end of Courtney's fourth grade year, the evaluation team[4] convened to determine whether Courtney was eligible for special education. After considering Hawaii DOE's assessments and an IQ test that indicated Courtney had a low-average IQ, Hawaii DOE determined that Courtney was not eligible for special education because no "severe discrepancy" existed between Courtney's IQ and her achievement on standardized tests. Courtney's mother and grandfather disputed Hawaii DOE's eligibility determination and requested that Hawaii DOE use the "response to intervention" model. Hawaii DOE never applied this alternative model to determine whether Courtney was eligible for special education.

---

[4]At a minimum, federal regulations require evaluation teams to include the child's parents, the child's regular teacher, and at least one person qualified to conduct diagnostic tests of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher. 34 C.F.R. § 300.308. At Courtney's meeting, the following individuals participated: the principal, psychological examiner, school psychologist, student services coordinator, resource teacher, several general education teachers, and Courtney's mother and grandfather.

### 3. *Dr. Murphy-Hazzard's Neuropsychological Evaluation*

In June 2006, Courtney's mother requested another special education evaluation of Courtney, including a neuropsychological evaluation and a dyslexia test. Hawaii DOE agreed to several additional assessments, but rejected these particular requests. After Courtney's pediatrician recommended that Courtney be evaluated for a possible learning disability by a neuropsychologist, Courtney's mother, at her own expense, hired Dr. Peggy Murphy-Hazzard ("Dr. Murphy-Hazzard"), a licensed clinical psychologist, to perform a neuropsychological evaluation of Courtney.

Dr. Murphy-Hazzard evaluated Courtney at the beginning of her fifth grade year. According to Dr. Murphy-Hazzard's tests, Courtney could only read at a third grade level, which fell in the low-average range, but comprehended at a fourth grade level, which fell in the average range. Dr. Murphy-Hazzard also noted that Courtney struggled with word recognition and spelling. Based on these observations, Dr. Murphy-Hazzard diagnosed Courtney with dyslexia and recommended immediate remediation and intensive tutoring.[5]

### 4. *November 29, 2006, Eligibility Meeting*

Courtney's final eligibility meeting occurred after the first quarter of the fifth grade on November 29, 2006. At the meeting, the evaluation team considered Dr. Murphy-Hazzard's report and the results of informal reading tests conducted by Liza Galindo ("Ms. Galindo"), Courtney's fifth grade teacher.

---

[5]Dr. Murphy-Hazzard also diagnosed Courtney with "attention deficit hyperactivity disorder" and "mixed receptive-expressive language disorder." The school psychologist, psychological examiner, and speech pathologist disputed some of these diagnoses at the eligibility meeting held on November 29, 2006. Courtney's eligibility for special education as a result of these diagnoses are not at issue in this appeal.

These tests showed that Courtney read at the fourth grade level at the start of the fifth grade. Courtney's reading did not significantly improve during the first quarter of the fifth grade. Despite evidence that Courtney had dyslexia and was not progressing adequately with regular intervention, Hawaii DOE once again determined that Courtney was not eligible for special education because her academic achievement was commensurate with her ability, as measured by her IQ.[6]

### 5.  *Individualized Dyslexia Tutoring*

Approximately one month after Hawaii DOE denied Courtney eligibility for special education, Courtney took another informal reading test. Courtney performed very poorly on fourth grade level reading comprehension and even struggled to comprehend at the third grade level. Frustrated with Courtney's lack of progress, Courtney's mother, at the family's expense, hired Dr. Kathy Ferguson ("Dr. Ferguson"), who is certified to teach dyslexic students, to help Courtney improve her reading skills.

Dr. Ferguson began tutoring Courtney in January 2007, the middle of Courtney's fifth grade year. Based on her initial assessments, Dr. Ferguson concluded that Courtney had a "quite severe reading disability" and that she read three grade levels behind. Dr. Ferguson provided Courtney with weekly dyslexia reading tutoring, which resulted in significant progress. By the end of her fifth grade year, Courtney "approached reading proficiency" according to a standardized state test. Moreover, Courtney performed better on informal reading tests, reading a fifth-grade-level passage with 95 percent

---

[6]Dr. Murphy-Hazzard found that Courtney had a higher IQ than indicated by Hawaii DOE's evaluation. According to Hawaii DOE, Courtney possessed only low-average intelligence, but Dr. Murphy-Hazzard's assessment showed that Courtney possessed average intelligence. Nevertheless, no severe discrepancy existed between Courtney's achievement and ability because Courtney's academic achievement scores were not significantly lower than her IQ score.

accuracy and 50 percent comprehension at the beginning of the sixth grade. Before Dr. Ferguson's tutoring, Courtney read a fourth grade passage with only 90 percent accuracy and 10 percent comprehension.

### 6.  *Assets School*

Despite Courtney's progress, Courtney still needed more help because she was so far behind. According to Dr. Ferguson, Courtney needed more intensive special education services to address her reading fluency and vocabulary deficits. In addition to private dyslexia tutoring, Dr. Ferguson recommended that Courtney enroll in Assets School, a private school for dyslexic and gifted children that incorporates specialized instruction into its curriculum. At the beginning of Courtney's sixth grade year, while administrative proceedings were still pending, Courtney's mother withdrew Courtney from public school and, at her own expense, enrolled Courtney at Assets School.[7]

### C.  Procedural Background

#### 1.  *Administrative Proceedings*

On March 15, 2007, in the middle of Courtney's fifth grade year, Courtney's mother and grandfather requested a due process hearing, alleging that Hawaii DOE improperly denied Courtney special education services. Courtney's mother and grandfather asked the Hearing Officer to determine that Courtney was eligible for special education under the "specific learning disability" classification and requested intensive dyslexia tutoring and remediation, reimbursement for tutoring and non-DOE evaluations, and compensatory education for Courtney's fourth and fifth grade years.

---

[7]The annual tuition for Assets is $15,600, plus $1,600-$1,700 for busing. Courtney also attended a summer school at Assets, which cost approximately $1,600.

Courtney's mother produced four expert witnesses at the hearings, held on August 29-31 and December 27, 2007. These witnesses included Dr. Murphy-Hazzard, the clinical psychologist who performed Courtney's neuropsychological evaluation; Dr. Ferguson, a certified teacher of dyslexic students who provided Courtney private tutoring; Dr. Patricia Edelen-Smith, a professor in the Special Education Department at the University of Hawaii; and Dr. Peter Dorwick, a professor of Disability Studies at the University of Hawaii.

These experts consistently testified that the discrepancies between Courtney's sub-test scores indicate that she has a learning disability and that her learning disability depressed her IQ score. Dr. Ferguson testified from her personal experience tutoring Courtney that Courtney had a severe reading disability. Moreover, all the experts testified that Courtney needed special education to benefit from general education and avoid academic failure.

Hawaii DOE presented expert testimony by Dr. Abigail Royston ("Dr. Royston"), a Hawaii DOE school psychologist. Dr. Royston did not attend any of Courtney's special education eligibility meetings, and unlike several of Courtney's mother's expert witnesses, Dr. Royston had never met Courtney. Dr. Royston criticized Dr. Murphy-Hazzard's neuropsychological evaluation on a number of grounds, but ultimately agreed that Courtney had dyslexia. Nevertheless, she agreed with Hawaii DOE's conclusion that Courtney was not eligible for special education. Dr. Royston explained that a child with a disability must *need* special education to qualify for services. She surmised that Hawaii DOE determined that Courtney did not need special education because she was progressing with "regular education intervention." Dr. Royston conceded, however, that Courtney should be deemed eligible for special education if her progress during the fifth grade was attributable to the individualized dyslexia tutoring she received from Dr. Ferguson. Such tutoring qualifies as

special education.[8] According to Dr. Royston, the critical question was whether Courtney "had started to make the advances that we see that she made by the end of the fifth grade year before she started that [individualized dyslexia tutoring]."

Hawaii DOE also presented testimony by Ms. Galindo, Courtney's fifth grade teacher. Even though Ms. Galindo's informal reading tests showed that Courtney read below grade level at the start of the fifth grade and that Courtney did not improve by the time of her final eligibility meeting, Ms. Galindo testified that she did not believe Courtney needed special education because she observed some progress in the classroom.

On February 29, 2008, the Hearing Officer issued his decision, concluding that Hawaii DOE properly determined that Courtney was ineligible for special education under the "specific learning disability" classification. Although the Hearing Officer found that Courtney suffered from dyslexia, he determined that Courtney did not need special education because no "severe discrepancy" existed between her actual achievement and intellectual ability. The Hearing Officer also noted that Courtney did not need special education because the evidence suggested that she was progressing and had nearly reached proficiency in reading.

### 2.  *District Court Proceedings*

The district court affirmed the Hearing Officer's decision that Courtney was ineligible for special education under IDEA. First, the district court determined that the Hearing Officer's decision was entitled to deference because the Hearing Officer considered and discussed the available evidence, including testimony by Courtney's expert witnesses. Second,

---

[8]According to Dr. Royston, general tutoring provided by a private tutoring center did not qualify as special education.

the district court held as a matter of law that Hawaii DOE may use the "severe discrepancy model" under the 2006 federal regulations. Third, the district court held that Courtney's test results did not demonstrate a "severe discrepancy" between her intellectual ability and academic achievement because her scores on standardized achievement tests were higher than her IQ score.

Courtney's mother appeals the district court's decision, primarily arguing that Hawaii DOE improperly relied *exclusively* on the "severe discrepancy model" to determine whether Courtney was eligible for special education under the "specific learning disability" classification.[9] We agree.

## STANDARD OF REVIEW

We review a district court's findings of fact in IDEA cases for clear error, and we review its conclusions of law de novo. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996). We review the Hearing Officer's decision de novo, but we "must give deference to the [Hearing Officer]'s findings, particularly when . . . they are thorough and careful[,] [and] must give 'due weight' to judgments of educational policy." *Id.* (internal citations and quotation marks omitted). "We define 'due weight' as follows: [t]he court, in recognition of

---

[9]Courtney also argues that Hawaii DOE violated IDEA by failing to consider the results of Dr. Murphy-Hazzard's neuropsychological evaluation. This argument fails because the record shows that the evaluation team discussed the neuropsychological evaluation at length. IDEA only requires a school district to consider the results of a parent-initiated evaluation; it does not require a school district to adopt the conclusions of such an evaluation. *See* 34 C.F.R. § 300.502(c)(1).

Courtney also argues that Hawaii DOE shirked its child find duty. Under IDEA, all states have an obligation to ensure that children with disabilities residing in their state are identified, located and evaluated. *See* 20 U.S.C. § 1412(a)(3).

We need not reach this argument because we reverse and remand on the eligibility question.

the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1212 (9th Cir. 2008) (internal citations and quotation marks omitted).

## DISCUSSION

### I. Hawaii DOE's Regulations Requiring Exclusive Reliance on the "Severe Discrepancy Model" Violate IDEA

[1] Federal regulations cabin states' discretion to create special education eligibility criteria in two ways. First, states "[m]ust not require the use of the severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability." 34 C.F.R. § 300.307(a)(1). Second, states "[m]ust permit the use of a process based on the child's response to scientific, research-based intervention." 34 C.F.R. § 300.307(a)(2). These regulations were effective beginning October 13, 2006, and therefore were controlling at the time of Courtney's final eligibility meeting on November 29, 2006.

The district court held that § 300.307(a) does not bar use of the "severe discrepancy model." This holding misses the point. Courtney's mother concedes that the federal regulations permit use of the "severe discrepancy model," but contends that Hawaii DOE may not use the "severe discrepancy model" as "the *sole basis* of determining eligibility" (emphasis added).

[2] The plain and unambiguous language of § 300.307(a) prohibits states from requiring exclusive reliance on the "severe discrepancy model" and also requires states to allow use of the "response to intervention model." The Hawaii regula-

tions in effect at the time of Courtney's final eligibility meeting conflicted with § 300.307(a) by conditioning eligibility for special education on the existence of a "severe discrepancy" between academic achievement and intellectual ability without permitting use of the "response to intervention model." *See* Haw. Code R. § 8-56-26 (repealed Nov. 23, 2009). Hawaii DOE did not amend its regulations to conform with federal law until November 23, 2009—more than three years after the federal regulations were effective. *See* Haw. Code R. § 8-60-41. Accordingly, Hawaii DOE procedurally violated IDEA by requiring use of the "severe discrepancy model" to determine whether a child is eligible for special education under the "specific learning disability" classification.

**[3]** Hawaii DOE argues that it is not subject to § 300.307(a)(1). By its terms, § 300.307(a)(1) applies to states and not to local school districts. *See* John Dinan, *The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates*, 70 Alb. L. Rev. 927, 965 (2007). Unlike other states, Hawaii only has a state educational agency and does not have separate local school districts. *Id.* Thus, Hawaii DOE serves *both* as the state educational agency, which creates statewide education regulations, and as the local school district, which provides educational services directly to students. *Id.* Because of these unique circumstances, Hawaii DOE argues that § 300.307(a) should not apply. According to Hawaii DOE, application of § 300.307(a) would deprive Hawaii DOE of its right to choose the best method for identifying students with a "specific learning disability," a right every other school district enjoys.

**[4]** While Hawaii DOE is correct that it functions as both a state agency entrusted with IDEA compliance and as a direct provider of educational services, Hawaii DOE is incorrect that it may shirk its responsibilities as a state educational agency just because it also provides educational services

directly to students. Under the amended regulations, no state educational agency may condition eligibility for special education on the existence of a "severe discrepancy" between academic achievement and intellectual ability, and every state must allow use of the "response to intervention" model.[10] 34 C.F.R. § § 300.307(a)(1), (2). As a state educational agency, Hawaii DOE was required to promulgate regulations that are consistent with federal regulations. *See* 20 U.S.C. §§ 1407(a), 1412(a)(11). Hawaii DOE failed to fulfill this obligation by continuing to operate under regulations that required use of the "severe discrepancy model" and did not permit use of the "response to intervention model." Accordingly, Hawaii DOE procedurally violated IDEA.[11] To hold otherwise would be detrimental to the children of Hawaii and contrary to legislative intent. *See* H.R. Rep. 108-77, at 107 (noting that exclusive reliance on the "severe discrepancy model" may result in delayed or incorrect identification of students who are eligible for services under IDEA); *accord* Weber, *supra* 123-27.

---

[10]Our dissenting colleague agrees that "34 C.F.R. § 300.307(a)(1) prohibits states from requiring local districts to use the severe discrepancy model." Dis. Op. at 17049. Our colleague further notes that "[t]he final regulations left the choice of whether to use the severe discrepancy model or alternative procedures to the discretion of local school districts." Dis. Op. at 17048. But, according to the dissent, Hawaii DOE's unique situation—as a direct provider of educational services—renders it more like a local school district and, thus, the regulation's prohibition is inapplicable. If that were so, any state could effectively remove from any local school district the discretionary authority to choose whether to use the severe discrepancy model or an alternative model by providing direct educational services itself, for whatever reason that state chose to do so. Moreover, Congress was presumably aware of Hawaii's unique situation and made no exception for it.

[11]In so holding, we certainly mean no disrespect to our dissenting colleague or to the State of Hawaii. We merely hold Hawaii and Hawaii DOE to the same standards Congress has chosen for all states and state agencies entrusted with IDEA compliance.

## II.    Whether Courtney Was Erroneously Found Ineligible for Special Education

**[5]** A procedural violation of IDEA is harmless unless it deprives the child of an educational opportunity. *See R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007). A child experiences an egregious loss of educational opportunity when she is erroneously denied eligibility for special education services. *Cf. T.A.*, 129 S. Ct. at 2495 ("It would be particularly strange for the Act to provide a remedy, as all agree it does, when a school district offers a child inadequate special education services but to leave parents without relief in the more egregious situation in which the school district unreasonably denies a child access to services altogether."). Thus, our next task is to determine whether Hawaii DOE's unlawful regulations, which require use of the "severe discrepancy model," resulted in an improper special education eligibility determination.

Hawaii DOE eventually amended the unlawful regulations applied at Courtney's eligibility meeting to conform with federal law. Haw. Code R. § 8-60-41(a)(1)-(2). Under these new, conforming regulations, an evaluation team may find a student eligible for special education under the "specific learning disability" classification if:

(1) (A) The student does not achieve adequately for the student's age or to meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the student's age or State-approved grade-level standards:

(i) Oral expression;

(ii) Listening comprehension;

(iii) Written expression;

(iv) Basic reading skill (including phonemic awareness, phonics, and/or vocabulary);

(v) Reading fluency skills;

(vi) Reading comprehension;

(vii) Mathematics calculation;

(viii) Mathematics problem solving; or

(B) The student demonstrates a severe discrepancy between actual achievement and intellectual ability by a difference of at least one and one-half standard deviations in one or more of the areas in subparagraph (A); and

(2) (A) The student does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in paragraph (1)(A) when using a process based on the student's response to scientific, research-based intervention; or

(B) The student exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments
. . . .

Haw. Code R. § 8-60-41(a)(1)-(2). Unlike Hawaii's prior regulations, these new regulations do not require a "severe discrepancy" between intellectual ability and academic achievement. Moreover, these new regulations permit use of the "response to intervention model." *Id.*

**[6]** Under Hawaii's new regulations, a child will be deemed eligible for special education under the "specific learning disability" classification if she satisfies two sets of criteria. First, the child must demonstrate either (1) inadequate achievement, or (2) a severe discrepancy between achievement and ability. *Id.* Second, the child must demonstrate either (1) insufficient progress, or (2) a pattern of strengths or weaknesses in performance consistent with a "specific learning disability." *Id.* 20 U.S.C. § 1415(i)(2)(C)(iii) provides that a court should base its decision with respect to a child's eligibility on the preponderance of the evidence. The district court is the traditional forum in which facts are assessed and evidence is weighed, as it has the ability to delve deeply into factual records and, where necessary, conduct evidentiary hearings. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402-03 (1990) (noting, in the context of Rule 11, that "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard"); *In re Bradford*, 112 B.R. 347, 352 (9th Cir. 1990) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)) ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise."). Therefore, the district court is the appropriate authority to assess and reach a conclusion as to Courtney's eligibility for special education under the "specific learning disability" classification, a primarily fact-based inquiry. Accordingly, this court hereby remands this case back to the district court to determine, by a preponderance of the evidence, whether Courtney would be eligible for special education under the "specific learning disability" classification.

## III.    Reimbursement

Courtney's mother seeks reimbursement for Courtney's private school tuition at Assets, private tutoring, and related expenses.[12] We may award reimbursement for private school

---

[12]Although Courtney's mother requested reimbursement for non-DOE evaluations at the due process hearing, she does not request such reimbursement in her civil action.

placement if a school district unreasonably finds a child with disabilities ineligible for services under IDEA and the private school placement is appropriate. *See T.A.*, 129 S. Ct. at 2495-96. Reimbursement is also available for private tutoring and related services, such as transportation. *See, e.g., Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1528 (9th Cir. 1994) (holding that reimbursement for reasonable transportation to private school placement is permitted as a related expense); *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1487 (9th Cir. 1992) (awarding parents reimbursement for private tutoring).

**[7]** As discussed above, the district court must determine whether Hawaii DOE erroneously denied Courtney eligibility for special education under the "specific learning disability" classification. We remand to the district court to determine whether Courtney's privately procured education, including private school placement, private tutoring and related services, was appropriate and to award reimbursement accordingly. *See, e.g., Adams v. Oregon*, 195 F.3d 1141, 1151 (9th Cir. 1999) (finding in favor of student, but remanding to the district court to determine whether private services obtained by student's parents were appropriate); *accord D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 569 (3d Cir. 2010) (finding in favor of student, but remanding to the district court to determine the precise relief that should be afforded to the student, including reimbursement).

## CONCLUSION

Hawaii DOE procedurally violated IDEA by applying regulations that require exclusive reliance on the "severe discrepancy model" at Courtney's final eligibility meeting. This violation deprived Courtney of a significant educational opportunity because it resulted in an erroneous eligibility determination. Accordingly, we REVERSE the district court's order affirming the Hearing Officer's decision and REMAND for further proceedings to determine (1) whether Courtney has

a "specific learning disability" and is eligible for services under IDEA, (2) whether Courtney's placement at Assets and private dyslexia reading tutoring is appropriate, and (3) the appropriate amount of reimbursement.

**REVERSED AND REMANDED.**

---

CLIFTON, Circuit Judge, dissenting:

According to the majority, there is only one school district in the entire country which is forbidden from deciding for itself whether to use the "severe discrepancy model" in determining whether a student has a specific learning disability. That school district is not one in which either of the judges in the majority live. It is where I live: the state of Hawaii.

The majority's decision is not based on any particular animus toward me, nor, I am sure, by any antagonism toward the state of Hawaii. Nonetheless, I view the majority opinion as remarkably disrespectful towards the state, simply because Hawaii has decided to operate its public schools through a single statewide school district. Because the majority opinion is also wrong in its interpretation of federal law regarding the authority of the Hawaii Department of Education ("Hawaii DOE") under IDEA and has not shown the proper deference to the findings of the hearing officer, I respectfully, but forcefully, dissent.

## I.    Hawaii DOE's Regulations Requiring Exclusive Reliance on the "Severe Discrepancy Model" Did Not Violate IDEA

Hawaii is the only state in the nation that has placed the primary responsibility for public education on the state itself. It does not operate public schools through smaller local districts. The majority ignores the fact that the Hawaii DOE is the local

educational agency and treats it instead as if its role was that of supervising the actual local school authorities.

Neither the federal statute nor the regulations prevent any local educational agency from using the severe discrepancy model to determine the existence of a specific learning disability. Indeed, the statute, as amended, is explicitly worded in a way that reflects the intent to permit the local agency to decide for itself. As the majority opinion describes, at 17027-28, federal regulations formerly compelled the use of the severe discrepancy measure. In 2004, Congress eliminated that requirement. As amended, 20 U.S.C. § 1414(b)(6)(A) provides that "when determining whether a child has a specific learning disability . . . a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability."

Notably, the statute was not amended to say that a local school district was forbidden to use that measure. Congress could have so provided if that was its intent, but it did not. Instead, Congress left the matter to the local district's judgment. The legislative history behind the 2004 amendments to IDEA clearly indicated the intent of Congress to "specifically allow[s] local educational agencies to continue to use the discrepancy model." *See* H.R. Rep. 108-77, Sec. 204, at 107 (2003).

That Congress intended for the decision to be made by the local school district was further demonstrated by its approach to the alternative "response to intervention" model. The statute allows but does not require use of that model. *See* 20 U.S.C. § 1414(b)(6)(B) ("In determining whether a child has a specific learning disability, a local educational agency may use a process that determines if the child responds to scientific, research-based intervention"). Language in proposed regulations would have authorized states to completely forbid local educational agencies from using the severe discrepancy

model, but that language was deleted in response to concerns that it exceeded the language of the statute. *See* 70 Fed. Reg. 35864 (June 21, 2005); Dixie Snow Huefner, *The Final Regulations for the Individuals with Disabilities Education Improvement Act (IDEA '04)*, 217 Ed. Law Rep. 1, 8-9 (2007). The final regulations left the choice of whether to use the severe discrepancy model or alternative procedures to the discretion of local school districts. *See* 34 C.F.R. § 300.307(a)(2); *Paul Secunda, "At Best An Inexact Science": Delimiting the Legal Contours of Specific Learning Disability Eligibility Under IDEA*, 36 J.L. & Educ. 155, 161 (2007) (book review) (noting that the federal regulations allow local school districts substantial latitude in choosing between severe learning disability eligibility criteria).

The Hawaii DOE, though obviously an arm of state government, is the local educational agency for Hawaii. It would make far more sense for us to treat it that way. IDEA defines "local educational agency" as a "public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for public elementary schools or secondary schools in a city, county, township, or school district." 20 U.S.C. § 1401(19)(A). Hawaii has only one school district. The Hawaii DOE, together with the state Board of Education, is responsible for making policy decisions, performing administrative functions, and providing educational services directly to students.[1]

---

[1]It is possible, of course, to debate the merit of having a single school district for the entire state. That subject has been discussed in Hawaii on a recurring basis, but proposals to break the state into smaller local school districts have not been enacted. The statewide district is consistent with Hawaii's approach to governance generally. The division of responsibility and authority in Hawaii is unusually tilted toward state government versus municipalities. Similarly, the only political subdivisions in Hawaii are four county governments, each covering one or more entire islands. There are no town or city governments covering smaller areas.

According to the majority, the Hawaii DOE, simply because it is a state agency, lacks the ability to decide for itself how to determine eligibility criteria under IDEA. Every other school district in the country has that authority, even local districts with student populations that far exceed Hawaii's.[2]

The majority's interpretation contradicts legislative intent and the plain text of the statute and federal regulations. The majority is right that 34 C.F.R. § 300.307(a)(1) prohibits states from requiring local districts to use the severe discrepancy model. But this prohibition was clearly intended to limit what states may compel local educational agencies to do, in the typical situation where local agencies are entities other than the state. *See* H.R. Rep. 108-77, Sec. 204, at 107 (2003). It does not limit how the state may define eligibility criteria in the unique situation — applicable only to Hawaii — when it is also acting in the capacity of a local educational agency. Congress surely did not intend to deny the local school authority in Hawaii the same authority that is expressly recognized in all other school districts. The majority opinion gives no logical reason for doing so.

Hawaii DOE did not "shirk its responsibilities as a state educational agency," as the majority opinion claims, at 17040. It has not "required" that school districts under its supervision use the severe discrepancy measure. Rather, it simply exercised its authority under the IDEA to choose whether or not

---

[2]In 2009, the Los Angeles Unified School District served approximately 688,000 K-12 students. New York City's Department of Education provided education to 1.1 million students. Hawaii's DOE served only about 180,000 students. *See* Los Angeles Unified School District, "Fingertip Facts," http://www.teachinla.com/Research/faq_notebook/2009-2010/A1.pdf; New York City Department of Education, "About Us," http://schools.nyc.gov/AboutUs/default.htm; Hawaii Department of Education, "About Us," http://doe.k12.hi.us/about/index.htm (last visited Aug. 23, 2011).

it would itself use the severe discrepancy standard.[3] As such, the Hawaii regulations in place at the time of Courtney's eligibility hearing did not procedurally violate the IDEA.

The majority opinion's effort to justify its conclusion in response to this dissent is remarkably unpersuasive. The majority suggests that if the State of Hawaii is treated as a "local educational agency" under the regulation, then "any state could effectively remove from local school districts the discretionary authority to choose whether to use the severe discrepancy standard or an alternative model by providing direct educational services itself." Majority opinion, at 17041 n. 10. So what? If any other state adopted Hawaii's system of a single statewide school district, there would, of course, be no other "local school districts" within that state to exercise any authority. But what does that establish? Hawaii's statewide system existed long before the federal statute and regulations were amended in 2004 and 2006, so it obviously wasn't set up to evade those enactments. And nobody can seriously suggest that any state would abolish local school districts and take on for itself the entire responsibility for public education simply to evade the regulation in order to be able to require the use of a severe discrepancy standard. Congress very clearly did not prohibit a local agency from deciding to use the severe discrepancy standard. Hawaii should have the same freedom to decide for itself that all other school districts in the country do.

The second justification offered in the same footnote of the majority opinion is even emptier, if that's possible. That Congress did not make an exception for Hawaii is not a surprise

---

[3]As the majority opinion notes, at 17028, in 2009 Hawaii decided to move away from the severe discrepancy approach itself, by repealing the regulations that called for use of that measure. But in doing so, Hawaii did not thereby "conform its regulations to federal law," as asserted by the majority opinion, at 17030. It simply exercised its judgment as to what measure to use in determining the existence of specific learning disabilities, as federal law authorized it to do.

because the statute and regulation, read logically, do not require an exception for Hawaii. The Hawaii Department of Education is the "local educational agency" for Hawaii; it is not some state overseer. The majority opinion justifies its result only by assuming the correctness of that result. The majority opinion fails to explain why Hawaii should be treated differently, and its inability to do so underscores the emptiness of its reasoning.

## II.  Courtney Was Not Erroneously Found Ineligible for Special Education

Since the previous regulations were lawful, it should not be necessary to consider Courtney's eligibility under the amended regulations. Nevertheless, under either version, the hearing officer had a sufficient basis to conclude that Courtney did not demonstrate a specific learning disability.[4]

We must accord deference to the hearing officer's findings when they are "thorough and careful." *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996). We also accord deference to the policy decisions of a school district when it is acting within the boundaries of federal and state law. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 2004). It is not the role of this court to substitute its "own notions of sound educational policy for those of the school authorities which they review." *See Wilson v. Marana Unified Sch. Dist.*, 735 F.2d 1178, 1183 (9th Cir. 1984). Unfortunately, the majority opinion wants to reach a different result so it does exactly what we are not supposed to do.

The hearing officer laid out the factual basis for his deci-

---

[4]Under the amended regulations, the child must demonstrate either (1) inadequate achievement, or (2) a severe discrepancy between achievement and ability; and either (1) insufficient progress, or (2) a pattern of strengths or weaknesses in performance consistent with a "specific learning disability." *See* Haw. Code R. § 8-60-41(a)(1)-(2).

sion and carefully considered all of the testimony and reports. The officer discussed, in detail, instances where the testimony of an expert or teacher contradicted the findings of Courtney's expert witnesses. His conclusions that Courtney did not show a need for special education and services, Haw. Code R. § 8-56-15, and that she did not qualify for special education under the specific learning disability category, Haw. Code R. § 8-56-26(b), were thorough and well-reasoned. The district court concluded that the evidence in the record supported his findings, and I agree.

The hearing officer did not err in finding that Courtney did not demonstrate a discrepancy between her academic achievement and intellectual ability sufficient to constitute a specific learning disability. Haw. Code R. § 8-56-26(b). The DOE measured Courtney's IQ using the Wechsler Intelligence Scale for Children — Fourth Edition. Courtney's full-scale IQ was 82, which was in the low-average range. However, academic assessments conducted by the DOE in May 2006 indicated that her reading skills were in the average range. On the Woodcock-Johnson III Tests of Achievement ("WJ-III"), her "basic reading" and "reading comprehension" scores were average, and her "broad reading" score was "low average." On the Kaufman Test of Educational Achievement, Second Edition ("KTEA-II"), her "reading" and "reading fluency" scores were rated as average. The DOE's psychological examiner concluded that Courtney's "sight vocabulary, phonics, structural analysis skills, and reading comprehension skills were all measured within the average range for her age" on both tests. Her scores were equivalent to if not higher than her IQ.

Courtney clearly struggled with reading, and she demonstrated signs of dyslexia. But according to school psychologist Dr. Abigail Royston, the evidence suggested that her dyslexia was mild. The hearings officer, noting substantial evidence of Courtney's adequate reading performance, properly rejected the conclusions of Courtney's expert witnesses that her diffi-

culties with reading were severe enough to warrant special education. The WJ-III and KTEA-II scores, and the observations of school psychologists and Courtney's teachers, indicated that Courtney was near-proficient in reading by her fifth-grade year. Psychological examiner Cigdem Fernandez, who administered the reading assessment tests, noted that Courtney demonstrated "the ability to read high-frequency words, sound out unfamiliar words, and comprehend connected discourse while reading at an age appropriate level." After a November 9, 2006 evaluation of Courtney's speech, hearing, and language abilities, speech pathologist Hanna Mendes concluded that Courtney's overall language skills were in the average range and that she has "adequate language and articulation abilities to succeed in a regular education classroom." Courtney's score on a state standardized reading test in the spring of 2007 was 296, which was on the upper end of the "approaches proficiency" range. Her score was similar to the average score of fifth graders in her school and fifth graders statewide.

The majority incorrectly suggests that Courtney's strong performance on the 2007 state reading test was the direct result of her weekly reading tutoring with Dr. Ferguson. In reality, Courtney was showing substantial progress before she began her tutoring with Dr. Ferguson in January 2007. Burns and Roe reading assessments conducted in August 2006 and November 2006, at the beginning of Courtney's fifth grade year, indicated that she was reading at the fourth grade level. According to Courtney's teacher Liza Galindo, Courtney showed substantial improvement on the November 2006 assessment. On that test, she "went back and reread for understanding and went back and corrected word substitutions," strategies Galindo had not seen before. By the spring of that academic year, according to the state's reading assessment, Courtney was reading at a level near-equivalent to her peers. By her sixth grade year, according to Galindo, Courtney had continued to improve and was showing increased reading comprehension and fluency.

The record does not compel the conclusion that Courtney's academic achievement was incommensurate with her intellectual abilities, that her reading performance was substantially below average, or that she required special education to perform adequately in school. Haw. Code R. § 8-56-15; § 8-60-41(a)(1)-(2). The DOE determined that Courtney's difficulties with reading could be addressed through assistance in the regular classroom setting. Courtney's improvement during her fifth and sixth grade year attest to her ability to make progress without special education. We must defer to the hearing officer's appropriate conclusion that a given child did not demonstrate eligibility for special education. *See Union Sch. Dist.*, 15 F.3d at 1524. We should do so here.

## III.   Conclusion

The judgment of the district court should be affirmed. It is wrong for the majority to substitute its judgment for that of the hearing officer. It is even more wrong for the majority to treat Hawaii as a second-class state, unable to make for itself a decision that every other school district in the country is permitted to make. I dissent.