**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| M.M.; E.M., individually and on behalf of their minor son C.M., *Plaintiffs-Appellants*, <br><br> v. <br><br> LAFAYETTE SCHOOL DISTRICT, a local educational agency; LAFAYETTE BOARD OF EDUCATION, *Defendants-Appellees*. | No. 12-15769 <br><br> D.C. No. 3:10-cv-04223-SI |
| M.M.; E.M., individually and on behalf of their minor son C.M., *Plaintiffs-Appellants*, <br><br> v. <br><br> LAFAYETTE SCHOOL DISTRICT; LAFAYETTE BOARD OF EDUCATION; STATE OF CALIFORNIA DEPARTMENT OF EDUCATION; JACK O'CONNELL, as State Superintendent of Public Instruction for the State of California; DANA SASSONE; CALIFORNIA DEPARTMENT OF GENERAL SERVICES; WILL BUSH, *Defendants-Appellees*. | No. 12-15770 <br><br> D.C. No. 3:09-cv-04624-SI <br><br> AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, Senior District Judge, Presiding

Argued and Submitted
November 5, 2013—San Francisco, California

Filed September 16, 2014
Amended October 1, 2014

Before: Sidney R. Thomas and Johnnie B. Rawlinson,
Circuit Judges, and Kevin Thomas Duffy, Senior District
Judge.[*]

Opinion by Judge Thomas;
Dissent by Judge Rawlinson

---

**SUMMARY[**]**

---

**Individuals with Disabilities Education Act**

Affirming in part and reversing in part the district court's
judgment, the panel held that a school district's failure to
provide educational testing data to parents violated the
procedural requirements of the Individuals with Disabilities

---

[*] The Honorable Kevin Thomas Duffy, Senior District Judge for the U.S.
District Court for the Southern District of New York, sitting by
designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

Education Act and prevented the parents from meaningfully participating in the creation of their son's individualized education program, thereby denying him a free appropriate public education under the IDEA.

The panel held that the school district did not fail to properly incorporate "Response-to-Intervention" or "RTI" testing data into the student's initial evaluation. The school district did, however, violate the IDEA by failing to insure that the RTI data was documented and carefully considered by the entire IEP team and failing to furnish the parents with the data, thereby making it unable for them to give informed consent for both the initial evaluation and the special education services their son received. The panel held that this procedural violation denied the student a FAPE because it seriously infringed his parents' opportunity to participate in the IEP formulation process.

The panel did not reach questions of whether the resulting IEPs were reasonably calculated to enable the student to receive educational benefits, whether the school district otherwise procedurally violated the IDEA, or whether an assessment of the student was otherwise appropriate. In light of its holding that the student was denied a FAPE, the panel remanded for reconsideration of whether the parents were entitled to reimbursement for the cost of private instruction.

Addressing issues concerning two earlier proceedings before the Office of Administrative Hearings, the panel affirmed the district court's conclusion that the parents' claim for reimbursement of the cost of an evaluation was moot. The panel held that the parents were not denied due process in the first OAH proceeding. The panel affirmed the district

court's determination that two of the three claims raised in the second OAH proceeding were time-barred.

The panel affirmed the dismissal of claims against the State of California Department of Education for failing to properly oversee the OAH proceedings and for staying its investigation.

The panel affirmed in part the dismissal of retaliation claims under § 504 of the Rehabilitation Act and remanded for the district court to consider one claim in the first instance.

The panel remanded for reconsideration the issue of the parents' request for attorneys' fees under 20 U.S.C. § 1415(i)(3)(B).

Judge Rawlinson dissented from the majority's holding that the school district failed to provide the student a FAPE and from the reversal of the award of attorneys' fees. She wrote that no procedural violation of the IDEA was committed by the school district because the RTI assessments were not a mechanism used to identify students in need of special education. Judge Rawlinson also disagreed that the district court failed to address one Rehabilitation Act claim. She wrote that she would affirm the district court's judgment in its entirety.

**COUNSEL**

Lina Foltz, Oakland, California, for Plaintiffs-Appellants.

Amy R. Levine (argued), Dannis Woliver Kelley, San Francisco, California; Louis Leone, Stubbs & Leone, Walnut Creek, California, for Defendants-Appellees Lafayette School District and Lafayette Board of Education.

Amy Bisson Holloway, General Counsel, Edmundo Aguilar, Assistant General Counsel, and Leonard Garfinkel (argued), Deputy General Counsel, California Department of Education, Sacramento, California, for Defendants-Appellees California Department of Education and Jack O'Connell.

**OPINION**

THOMAS, Circuit Judge:

In this appeal we consider, among other matters, whether a school district's failure to provide educational testing data to parents violated the procedural requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1487 ("IDEA" or "Act"). We conclude that it did. We also conclude that the failure to provide the data prevented the parents from meaningfully participating in the creation of his individualized education program ("IEP"), thereby denying their son a free appropriate public education ("FAPE") under the IDEA.

I

These consolidated appeals arise out of three administrative complaints and three district court lawsuits concerning the educational opportunities provided to C.M., a child who has been identified as an individual with learning disabilities. C.M.'s parents, M.M. and E.M., appeal from the district court's decision to affirm the Office of Administrative Hearings ("OAH") judge's conclusion that the Lafayette School District (the "District") did not violate the IDEA.

During the 2005–2006 school year, the District implemented a new Response-to-Intervention ("RTI") approach to assist struggling learners in the general education program. The District used RTI as an intermediate step before referring a student for special education placement. Reading Specialist Carol Harris conducted "universal assessments" of all students in kindergarten through third grade three times each school year, which included the Slosson Oral Reading Test ("SORT") and the Dynamic Indicators of Basic Early Literacy Skills ("DIBELS") test. District staff then came together after each assessment period to discuss each student's results to "pinpoint children that need support beyond . . . general instruction," to guide the intervention—or additional instruction—the child would then receive, and to monitor the progress the student made in response to the implemented intervention. These meetings were called "Assessment Wall" meetings, and they were attended by Principal Mary Maddux, Instructional Support Teacher ("IST") Jane Jones, Reading Specialist Harris, and the general education teachers from each grade level. The complete RTI assessment results and related graphs were not given to parents.

That same year, C.M. began kindergarten at Lafayette Elementary School when he was six years old. Through RTI, the District identified C.M. as in need of reading intervention and began providing him additional instruction, which continued throughout his kindergarten year and into the following summer via a special summer class. Specifically, C.M.'s DIBELS results during his kindergarten year placed him at benchmark in Phoneme Segmentation Fluency but below benchmark in Initial Sound Fluency, Letter Naming Fluency, and Nonsense Word Fluency. His kindergarten report card indicated some areas in reading and writing where he met grade level standard and some areas where he was approaching grade level standard.

In first grade, C.M. continued to receive reading intervention. In October, his parents submitted a written request to the District to perform an evaluation of C.M. for learning disabilities. The District convened two Student Study Team ("SST") meetings with the parents in November and February before referring C.M. for the special education evaluation. The SST meeting notes referenced in narrative form C.M.'s difficulties, the parents' and teachers' concerns, and the interventions he was receiving. C.M.'s RTI data graphs were not reviewed during the SST meetings, and the February meeting notes reference only his mid-year SORT score and his overall DIBELS Strategic rating, which denotes a below benchmark rating.

The District eventually completed a special education Assessment Plan on February 20, 2007, and on that same day obtained E.M.'s consent to move forward with the initial evaluation. The District conducted the evaluation in March and April, which included an educational readiness assessment by IST Jones and intellectual development and

developmental history assessments by School Psychologist Intern Michelle Charpentier. Although the Assessment Plan also included social/emotional and motor/perceptual development assessments those assessments were not performed.

The District emailed the assessment results to C.M.'s parents on April 17, 2007, and held the first meeting of C.M.'s IEP team the following day. Based on the evaluation, the IEP team, which included the parents, determined C.M. was eligible for special education because he had a phonological processing disorder.[1] A phonological processing disorder is one subset of an auditory processing disorder and relates specifically to the phonemic awareness pillar of reading,[2] which "refers to a person's ability to detect and access the sound structure of language." Based on this eligibility determination, the IEP team developed an education program in which C.M. would begin participating in the school's Instructional Support Program ("ISP"), receiving instruction in language arts from IST Jones for 45 minutes a day, four times a week, to help him with his difficulties in reading and writing. The IEP team meeting lasted approximately 30 to 45 minutes.

---

[1] C.M.'s Specific Learning Disability Eligibility Summary form, which commemorates his eligibility determination, provides a list for the IEP team to mark which particular Processing Disorder a child may have. The list included: Attention, Auditory Processing, Phonological Processing, Visual Processing, Working Memory, Sensory-Motor Skills, Cognitive Abilities, and Executive Functioning.

[2] The five pillars of reading are phonemic awareness, decoding, fluency, comprehension, and vocabulary.

C.M. participated in the ISP for the remainder of his first grade year, and at the end of the year, his DIBELS results placed him above benchmark in Phoneme Segmentation Fluency but below benchmark in Nonsense Word Fluency and Oral Reading Fluency. His first grade report card indicated he was below grade level standard in reading and approaching grade level standard in writing.

In second grade, C.M. continued to participate in the ISP. In late November, his parents obtained a private evaluation from Doctor of Audiology Dimitra Loomos. Dr. Loomos's evaluation revealed that C.M. had a central auditory processing disorder ("CAPD") that was related to his learning disability. Auditory processing "is defined as the execution and coordination of specific auditory mechanisms in an interactive manner . . . that allows the central nervous system to detect, decode, synthesize and interpret auditory information."

Similar to the DIBELS assessment, C.M. demonstrated good phonemic awareness as well as good auditory discrimination, auditory closure, auditory figure/ground ability, and auditory attention. Conversely, C.M.'s performance showed "a deficit for integrating auditory information within the central auditory nervous system. . . [and] in the ability to perform binaural separation of auditory signals."

Dr. Loomos explains in her report that "[b]ecause we view the world simultaneously through the individual senses, we are constantly working to fit all the pieces together in order to get the whole picture. If the central nervous system is not properly integrating the auditory input with other sensory input (visual, tactile, etc.), the child ends up with an

incomplete puzzle . . . . Children displaying signs of poor integration skills on CAP tests may also demonstrate deficits in auditory-visual and/or visual-motor integration skills (e.g. writing, reading recognition, spelling, etc.)." Dr. Loomos made a number of recommendations for C.M. in terms of environmental modifications, direct interventions, and compensatory strategies.

C.M.'s second grade teacher, Jody Carson, was aware of Dr. Loomos's evaluation because she completed a report for Dr. Loomos, and E.M. gave a copy of the final evaluation report to Ms. Carson, IST Jones, and the school front desk when school resumed after the holiday break.

As of February, C.M.'s RTI SORT scores were declining. On March, 18, 2008, the District convened C.M.'s first annual IEP review meeting, and the IEP team developed a renewed IEP. However, the new IEP was not only identical to the previous IEP, it also failed to reference C.M.'s CAPD or provide for any modifications or accommodations to address his unique deficits. C.M.'s parents consented to the renewed IEP. About one week later, the parents received the final evaluation report for another private evaluation they obtained from Speech-Language Pathologist Deborah Swain, which found that C.M. "experiences a range from average ability to significant difficulty with specific skills of auditory-based language processing."

Thus, throughout the spring, the parents paid for C.M. to attend sound-based therapy, and conversations between E.M. and C.M.'s teachers were ongoing concerning C.M.'s CAPD and the recommendations contained in both evaluation reports. In May, an informal meeting was held at the parents' request to discuss C.M.'s need for a speech and language

assessment and clarification of the IEP to address C.M.'s CAPD. No amendments were made to the IEP. By the end of his second grade year, C.M. scored Below Basic in language arts on a state standardized test, which was shared with his parents. His DIBELS results placed him below benchmark in Oral Reading Fluency. His second grade report card indicated he was below grade level standard in both reading and writing.

Three weeks into C.M.'s third grade year, on September 17, 2008, the District convened an interim IEP team meeting at the parents' request to discuss, *inter alia*, their concern over his lack of meaningful academic progress, the need for improved goals and objectives in the IEP, and amendments to the IEP to better address C.M.'s CAPD. At the meeting, the parents also advised the District that they disagreed with the 2007 Assessment results, and later that day they requested in writing an independent educational evaluation ("IEE") at the District's expense.[3] For two months, the District did not respond to the IEE request and instead sought the parents' consent to reevaluate C.M., but the parents did not consent and they did not withdraw their request for an IEE.

In December, the parents obtained an evaluation at their own expense by Licensed Psychologist Tina Guterman. Dr. Guterman's educational evaluation, which included a review of C.M.'s prior evaluations and background, found that C.M.

---

[3] Once the parents disagreed with the assessment and requested an IEE, the District had two choices under the IDEA. It could, "without unnecessary delay," either provide the requested IEE or file a due process complaint with the California Department of General Services to defend the 2007 Assessment. 34 C.F.R. § 300.502(b)(2); Cal. Educ. Code § 56329(c).

had auditory processing weaknesses and severe dyslexia and that his IEP services were insufficient to meet his needs. Her report states that students with similar profiles as C.M. "make larger and more resilient gains through systematic immersion in a research based multi-sensory program delivered at a high level of intensity." Dr. Guterman made a number of recommendations for C.M.'s instructional program.

The parents subsequently withdrew C.M. from the ISP and enrolled him in an intense private reading and comprehension program that better addressed his multi-sensory integration deficits while they and the District continued to negotiate his IEP. The IEP team participated in a series of facilitated meetings over a period of seven months. The parents did not ultimately agree to a renewed IEP for C.M. until the end of his third grade year.

On November 18, 2008, the same day as the first facilitated IEP team meeting, the parents filed a compliance complaint with the California Department of Education ("Department of Education"), alleging that the District failed to comply with the IDEA procedures after their request for an IEE. Early in December, the District responded to the IEE request by filing a due process complaint with the California Department of General Services, defending the 2007 Assessment. The District also asked the Department of Education to stay its investigation of the parents' complaint because the IEE issue was pending in the OAH, and the Department of Education closed its investigation. After a three day hearing, the administrative law judge ("ALJ") issued a decision holding that the District unnecessarily delayed in defending the 2007 Assessment and also found that the parents waited too long to request the IEE. The ALJ therefore ordered the District to reimburse the parents for

only half the cost of Dr. Guterman's evaluation. The ALJ also found that conditions warranted reevaluation, and permitted the District to proceed with new assessments of C.M.

On April 16, 2009, the parents filed a due process complaint with the OAH, alleging 16 separate claims against the District regarding its identification of C.M. as a child with a disability and its development of an assessment plan, the appropriateness of the 2007 Assessment, and the District's development and oversight of the IEP. In August of that year, the parents filed a second due process complaint with the OAH, alleging in four claims that the District denied C.M. a FAPE. The ALJs dismissed the claims that arose before April 16, 2007, as being outside the statute of limitations, and after an eleven day hearing, held that the 2007 Assessment was appropriate, the District did not deny C.M. a FAPE, and C.M. was not entitled to receive reimbursement for his private compensatory education services.

Between August 2009 and September 2010, the parents initiated three lawsuits against the District and its Director of Student Services Dr. Dana Sassone, the Lafayette Board of Education, the Department of Education and its Superintendent, and the California Department of General Services and its Director, in federal district court seeking reversal of the OAH decisions, attorney's fees, and remedies for various violations of the IDEA, § 504 of the Rehabilitation Act, and the Constitution.

The district court issued multiple orders dismissing portions of the lawsuits and consolidating the remaining

claims.[4]  On February 7, 2012, the district court issued its final order, finding in favor of the District on all but one claim, and issued its final judgment on March 8, 2012.  The parents timely filed notices of appeal.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.

We review the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings.  *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987).  A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington N., Inc.*, 719 F.2d at 307. Questions of law and mixed questions of fact and law are reviewed de novo.  *Gregory K.*, 811 F.2d at 1310.

II

"The IDEA provides states with federal funds to help educate children with disabilities if they provide every qualified child with a FAPE that meets the federal statutory requirements." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).  Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ."  20 U.S.C.

---

[4] In a previous appeal concerning claims in the first lawsuit, we affirmed the district court. *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082 (9th Cir. 2012).

§ 1400(d)(1)(A). The IDEA provides for a cooperative process between parents and schools that culminates in the creation of an IEP for every disabled student. *See generally* 20 U.S.C. § 1414.

A core principle throughout the IDEA is meaningful participation by parents and informed parental consent, making the parents an integral part of the team that determines both whether the child is a child with a disability and the content of the child's IEP. *See* 20 U.S.C. §§ 1400(c)(5)(B), 1414(a)(1)(D), 1414(b)(4)(A); 34 C.F.R. § 300.306(a)(1). In crafting the Act, Congress also placed great emphasis on procedural safeguards to "ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). "Procedural compliance is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J.*, 267 F.3d at 891.

A FAPE is defined by the IDEA as "special education and related services that . . . are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9). "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability . . . ." 20 U.S.C. § 1401(29). An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14).

A school district "must comply both procedurally and substantively with the IDEA." *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Dirs., Missoula Cnty., Mont.*,

541 F.3d 1202, 1207 (9th Cir. 2008) (internal quotation marks omitted). Thus, to determine whether a school district has provided a FAPE, we make a two-part inquiry. First, we determine whether the school district "complied with the procedures set forth in the Act," and second, we determine whether "the individualized educational program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982).

"Under the 1997 amendments to the IDEA, a school must provide a student with a 'meaningful benefit' in order to satisfy the substantive requirement[]. . . ." *N.B.*, 541 F.3d at 1212–13. "However, the court need not reach the question of substantive compliance if the court finds procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits." *Id.* at 1207 (internal quotation marks omitted). The parents contend that the District failed to comply with both the procedural and substantive requirements of the IDEA.

A

C.M.'s parents argue that the District violated the procedural requirements of the IDEA because it failed to properly incorporate C.M.'s RTI data into C.M.'s initial evaluation and it failed to provide them with C.M.'s RTI data. They argue that the failure to provide them the RTI data forestalled them—as members of the IEP team—from carefully considering all available information in making the eligibility determination, prevented them from giving

informed parental consent for both the initial evaluation and the services C.M. would receive, and violated their right to examine C.M.'s records.  We conclude that the District did not fail to incorporate the RTI data into the evaluation, but that it violated the IDEA's procedural requirements by failing to provide the parents with the RTI data.

1

In conducting the initial evaluation, the school district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" to determine both whether the child is a child with a disability and the content of the child's IEP.  20 U.S.C. § 1414(b)(2)(A); *accord* 34 C.F.R. § 300.304(b)(1).   The agency "shall not use any single measure or assessment as the sole criterion" for determining eligibility.    20 U.S.C. § 1414(b)(2)(B); *accord* 34 C.F.R. § 300.304(b)(2).  In 2004, in response to scientific research establishing "that the 'severe discrepancy model' is not necessarily a good indicator of whether a child has a learning disability," Congress eliminated the "severe discrepancy" requirement and expressly permitted use of the "response to intervention model," allowing for either model to be used.  *Michael P. v. Dept. of Educ.*, 656 F.3d 1057, 1060–61 (9th Cir. 2011).  *See also* 20 U.S.C. § 1414(b)(6) ("when determining whether a child has a specific learning disability . . . a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy . . . [and] may use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures").   We held in *Michael P.* that the Hawaii Department of Education violated the IDEA by using only the

severe discrepancy model without permitting use of the response to intervention model. 656 F.3d at 1067.

Here, although the District had the choice, it used the severe discrepancy model for C.M.'s initial evaluation. To the extent the District argues it used solely the severe discrepancy model, the District would have violated the IDEA. *Id.* However, the record reflects that the District not only used a variety of assessment tools, but it also used C.M.'s RTI data to corroborate the 2007 Assessment. C.M.'s Eligibility Summary form noted that his "learning problem [was] corroborated by other assessment data." School Psychologist Patrick Gargiulo testified, while referencing that form, that "[w]e noted that the Student had been participating in response to intervention," and that the RTI data was the corroborating data. Thus, the District properly used a variety of tools, including C.M.'s RTI assessment data.

The parents argue that the IEP team was required to review the RTI data as part of the initial evaluation, citing 20 U.S.C. § 1414(c)(1). That section provides that "[a]s part of an initial evaluation (if appropriate) and as part of any reevaluation under this section, the IEP Team and other qualified professionals, as appropriate, shall review existing evaluation data on the child, including . . . current classroom-based, local, or State assessments" to "identify what additional data, if any, are needed" to determine eligibility or other needs. The qualifier "if appropriate," negates an express statutory requirement to review existing evaluation data as a part of the initial evaluation. We therefore conclude that the District did not procedurally violate the IDEA with respect to C.M.'s RTI data and the 2007 Assessment.

2

The District violated the IDEA by failing to ensure that the RTI data was documented and carefully considered by the entire IEP team and failing to furnish the parents with the data, thereby making the parents unable to give informed consent for both the initial evaluation and the special education services C.M. received.

"In interpreting evaluation data for the purpose of determining [both] if a child is a child with a disability . . . and the educational needs of the child, each public agency must [d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; *and [e]nsure that information obtained from all of these sources is documented and carefully considered*." 34 C.F.R. § 300.306(c)(1) (emphasis added).

The District argues it drew upon a variety of sources and ensured the documentation and consideration of all information. As we have noted, the District drew upon a variety of sources, including C.M.'s RTI data. However, the record shows that the District failed to ensure that the RTI data was documented and carefully considered by the entire IEP team. Although C.M.'s Eligibility Summary form noted corroboration of his RTI data, the form also directs, "Attach documentation." The District failed to attach or otherwise share with the entire IEP team any RTI documentation. Dr. Sassone testified that the documentation that should have been attached was the SST meeting notes that the parents already received. However, an email in which she instructed District staff to both attach the missing RTI documentation to

the form and provide her with better copies of the SST meeting notes conflicts with her testimony.

Additionally, "[u]pon completion of the administration and other evaluation measures, a copy of the evaluation report and the documentation of determination of eligibility shall be given to the parent." 20 U.S.C. §§ 1414(b)(4)(B); *accord* 34 C.F.R. § 300.306(a)(2) (and "at no cost to the parent"). The "documentation of the determination of eligibility" must contain a number of particular statements. The first relevant statement is "[t]he basis for making the determination, including an assurance that the determination has been made in accordance with § 300.306(c)(1)." 34 C.F.R. § 300.311(a)(2). The second relevant statement comes into play "[i]f the child has participated in a process that assesses the child's response to scientific, research-based intervention" and requires a statement of "[t]he instructional strategies used and the student-centered data collected; and [t]he documentation that the child's parents were notified about" certain state policies, strategies to increase the child's learning rate, and the parent's right to request an evaluation. 34 C.F.R. § 300.311(a)(7).

The District argues first that § 300.311 requires only a statement, not documentation, and that it provided such a statement. The regulation does require only a statement, and the Eligibility Summary form does provide a statement that the determination is in accordance with § 300.306, to satisfy § 300.311(a)(2). As for § 300.311(a)(7), the form provides statements that C.M. participated in RTI and that there was corroboration with other assessment data, and it provides a statement covering all documentation of which the parents were notified. However, it does not include a statement of

the instructional strategies used and the student-centered data collected.[5]

The District argues that § 300.311(a)(7) is only applicable if RTI was used to determine C.M.'s eligibility, it did not use an RTI method to determine C.M.'s eligibility, and neither of the formal evaluations relied on the RTI data. However, the District fails to cite to any authority establishing that § 300.311(a)(7) is limited to when RTI was used to determine eligibility, and the regulation conditions a statement if the child participated in a "process that *assesses* the child," not a process that determines the child's eligibility. That C.M. participated in RTI assessments and the severe discrepancy model was corroborated by C.M.'s RTI data is sufficient to deem the data applicable to the regulation. Dr. Sassone testified that she cannot say that the RTI that C.M. participated in would be the same as the scientific, research-

---

[5] The dissent notes that § 1414(b)(1) requires an educational agency to provide the parents of a child with disability notice of the evaluation procedures the agency "proposes to conduct." *Id.* The dissent argues that the agency never proposed to use the RTI assessment to determine C.M.'s eligibility for special education services, and therefore the district was not obligated to notify C.M.'s parents. However, this argument ignores the wholly separate requirement imposed by § 1414(b)(4). Under § 1414(b)(4), "documentation of determination of eligibility shall be given to the parent" upon completion of the evaluation. *Id.* Moreover, the dissent's position conflicts with the additional requirement that this documentation of determination of eligibility include a statement of the "instructional strategies used and the student-centered data collected" if the child has "participated in a process that assesses the child's response to scientific, research-based intervention." 34 C.F.R. § 300.311(a)(7). The most natural reading of the statute is that § 1414(b)(1) requires that the agency provide notice to the parent regarding the tests it intends to conduct on a child, and § 1414(b)(4) requires that the agency inform the parent of the results of those tests.

based intervention referenced in the regulation. But the fact that the Eligibility Summary form otherwise tracks the requirements of the regulation undermines her testimony. Moreover, she testified that the information on the Eligibility Summary form "provide[s] information related to what was used in . . . making a determination." Had the District either provided the required statement or attached the RTI documentation as the form instructed, the entire IEP team, including the parents, would have had all the information they needed to make a procedurally valid eligibility determination.

In addition, to ensure that underachievement is not due to a lack of appropriate instruction, "the group must consider, as part of the evaluation . . . [d]ata-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the child's parents." 34 C.F.R. § 300.309(b)(2).

The District argues that this provision is inapplicable because RTI was not used to determine eligibility, but again the District fails to cite to any authority. This provision particularly does not appear to call for RTI data only if that data was used to determine eligibility. To the contrary, because this provision is meant to ensure that underachievement is not due to a lack of appropriate instruction, it calls for any documentation of any repeated assessments. The RTI assessments performed on C.M. would have been beneficial here, especially given that the District staff met three times per year to discuss C.M.'s progress based on that data. We therefore conclude that the District procedurally violated the IDEA by failing to provide the entire IEP team with C.M.'s RTI data for the purpose of making his eligibility determination.

Finally, the IDEA requires informed parental consent before conducting an initial evaluation and before providing special education services to a child. 20 U.S.C. § 1414(a)(1)(D)(i). The school district must also establish procedural safeguards that provide "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child." 20 U.S.C. § 1415(b)(1)(A). Examination of records by parents is critical to the development of an IEP. *Amanda J.*, 267 F.3d at 892. In *Amanda J.*, the parents argued that Amanda was denied a FAPE because they were not provided with all of her school records, some of which indicated that she may have autism. *Id.* at 890. Because "[a]n IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed," we agreed. *Id.* at 892.

Without C.M.'s complete RTI data, his parents were unable to give informed consent for both the initial evaluation and the special education services he received. His parents did not request in writing all records relating to C.M. until the middle of his third grade year. However, the District had a procedural duty to share C.M.'s RTI data with his parents as early as C.M.'s first grade year, when it sought to obtain their informed consent for the initial evaluation. The District also had a procedural duty to provide the IEP team with the RTI data at the April 18, 2007, meeting for making the eligibility determination. The District therefore violated the procedural safeguards of the IDEA by not providing the parents with an opportunity to examine all records relating to C.M.

B

Having determined that the District procedurally violated the IDEA by not providing the parents with his complete RTI data, and because not all procedural violations deny a child a FAPE, *R.B., ex. rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007), we now consider whether the violation "result[ed] in the loss of educational opportunity, or seriously infringe[d] the parents' opportunity to participate in the IEP formulation process, or . . . caused a deprivation of educational benefits," *N.B.*, 541 F.3d at 1207.

Although the other members of C.M.'s IEP team were familiar with his RTI data because they participated in his Assessment Wall meetings three times a year, the parents were unfamiliar with the data and, more importantly, the picture the data painted of C.M.'s deficits and his progress during his kindergarten through third grade years. C.M.'s DIBELS measures on Initial Sound Fluency, Letter Naming Fluency, and Nonsense Word Fluency were below benchmark prior to his initial evaluation, but his measure on Phoneme Segmentation Fluency was at benchmark. Based on the 2007 Assessment results, the IEP team determined C.M. was eligible for special education services based upon a phonological processing disorder. This result conflicts with his Phoneme Segmentation Fluency  score, especially his above benchmark Phoneme Segmentation Fluency score and below benchmark Oral Reading Fluency score at the end of his first grade year. Without a complete presentation of the RTI data, the parents were unaware of the discrepancy and thus unable to properly consider C.M.'s particular processing disorder and the instructional strategies he needed. Also, at the time of the first annual IEP meeting in C.M.'s second grade year, his RTI data showed that his progress in the

language arts had declined after receiving special education services for nearly one year.  Despite his lack of progress, the IEP team made no changes to his educational program. Without the RTI data, the parents were struggling to decipher his unique deficits, unaware of the extent to which he was not meaningfully benefitting from the ISP, and thus unable to properly advocate for changes to his IEP.  We therefore conclude that the District's procedural violations prevented the parents from meaningfully participating in the IEP process.  Therefore, the District denied C.M. a FAPE.

C

Because we hold that the District failed to comply with the procedures mandated by the IDEA and that this failure denied C.M. a FAPE, we need not address the question of whether the resulting IEPs were reasonably calculated to enable C.M. to receive educational benefits.  *See Amanda J.*, 267 F.3d at 895.  Nor do we need to reach whether the District otherwise procedurally violated the IDEA or whether the 2007 Assessment was otherwise appropriate.

D

School districts may be ordered to reimburse the parents of a child who has been denied a FAPE for the cost of private instruction.  20 U.S.C. § 1412(a)(10)(C)(ii); *see also* 34 C.F.R. § 300.148(c).  During the OAH hearing and at the district court, the parents sought reimbursement for C.M.'s audiology and processing assessments, sound-based therapy, and private reading programs that they provided for C.M. at their own expense.  Both the ALJ and the district court determined that the parents were not entitled to reimbursement because they had concluded that the District

had not denied C.M. a FAPE. Because we conclude otherwise, we remand to the district court for reconsideration of this issue.

III

The parents contest three of the district court's rulings related to the first two OAH proceedings.

A

The district court properly concluded that the parents' claim for reimbursement of the cost of Dr. Guterman's evaluation was moot. In the first OAH proceeding, the ALJ ordered the District to reimburse the parents for half of the cost of Dr. Guterman's evaluation and permitted the District to complete a reevaluation of C.M. C.M.'s parents argue that the ALJ erred in reducing the reimbursement and authorizing the reevaluation. The district court determined that both issues are moot because the District not only paid half of Dr. Guterman's evaluation cost, but on September 2, 2011, voluntarily paid the other half as well. Additionally, by June 24, 2010, the District had completed its reevaluation of C.M.

"The jurisdiction of federal courts depends on the existence of a 'case or controversy' under Article III of the Constitution." *Pub. Utils. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996) (internal quotation marks omitted). No justiciable controversy is presented where the question sought to be adjudicated has been mooted by developments subsequent to filing of the complaint. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). The District's payment for the full cost of Dr. Guterman's

evaluation and completion of its reevaluation have mooted both issues.

C.M.'s parents claim the issues are not moot because the court otherwise had jurisdiction under § 1415 of the IDEA. However, regardless of other bases for jurisdiction, "[t]he court must be able to grant effective relief, or it lacks jurisdiction." *Pub. Utils. Comm'n of Cal.*, 100 F.3d at 1458. Since the court could no longer grant full reimbursement or deny reevaluation, the issues were moot. The parents also argue that they requested as a remedy declaratory relief. Yet, there must still be an "actual controversy" for a court to issue declaratory relief. *See* 28 U.S.C. § 2201. The parents further argue that the reevaluation performed by the District "was not the same reevaluation," but the record shows that the reevaluation sought by the District in the first proceeding was an evaluation to update the out-of-date 2007 Assessment. By June 2010, the District completed that evaluation. Finally, the parents argue that the reevaluation issue is live because they claim that the District's "conduct violated § 504 [of the Rehabilitation Act]." But, that argument is irrelevant because their § 504 claims were not deemed moot.

The parents further argue that collateral consequences prevent the claims from being moot. One exception to the mootness doctrine exists where a claimant would suffer "collateral legal consequences" if the action appealed were allowed to stand. *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 799 (9th Cir. 1999). The parents base their argument on their attempt to recover prevailing party attorneys' fees. However, "[t]he existence of an attorneys' fees claim . . . does not resuscitate an otherwise moot controversy." *Cammermeyer v. Perry*, 97 F.3d 1235, 1238 (9th Cir. 1996). The parents also argue that as a collateral

consequence, they and other parents are tainted by the ALJ's erroneous finding. This argument is not well taken. C.M.'s parents bring their claims individually and, as aptly stated by the District, "the mere existence of an adverse decision does not revive a moot claim, lest the mootness doctrine would become meaningless."

Finally, the parents argue that their claims are capable of repetition yet evading review. Another exception to the mootness doctrine provides that an otherwise moot issue will be heard "if it presents an issue that is capable of repetition while evading review." *Pub. Utils. Comm'n of Cal.*, 100 F.3d at 1459. To determine whether an issue is capable of repetition yet evades review, we determine (1) whether "the challenged action is of limited duration," and (2) whether there is "a reasonable expectation that the same complaining party will be subjected to the same action again." *Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985). The ALJ based his reimbursement and reevaluation decisions on the 17-month delay between the 2007 Assessment and the parents' request for an IEE. The parents argue that they are likely to again delay in requesting an IEE in the future because of summer vacation periods and unresolved issues that persist with C.M.'s IEP, and because the District is "likely to employ similar delay tactics and seek reevaluation to discourage making an IEE request because it can moot such claims at will." However, each reevaluation that could lead to an IEE request will be based on unique circumstances, just as the 2007 Assessment was based on unique circumstances. Thus, the district court did not err in determining the claims are not capable of repetition and otherwise moot.

B

The district court properly concluded that the parents' due process rights were not violated by a change in the wording of the issue presented.  The parents claim that the ALJ in the first OAH proceeding altered the hearing issues when he determined that reevaluation was warranted, thereby violating their due process rights and the IDEA.  The District's due process complaint stated as an issue, "[w]hen conditions warrant reassessment, the District has the right to conduct that assessment using its own personnel.  Therefore, if reassessment is warranted, the District has the right to conduct that assessment pursuant to the assessment plan proposed on September 24, 2008."  Additionally, the ALJ's Order Following Pre-Hearing Conference stated the issue as, "Does District have the right to assess Student as described in the September 24, 2008, assessment plan?"  The district court correctly concluded that the complaint "contemplated an analysis of whether conditions warrant reassessment" and that the parents were put on notice of the issue to be decided.[6]

C

The district court correctly determined that two of the three claims raised in the second OAH proceeding were time-barred.  In that proceeding, the parents' first three claims related to the District's failure to timely identify C.M. as a student with a learning disability and its failure to timely develop its Assessment Plan.  The ALJ dismissed those

---

[6] The parents raise three additional arguments that pertain to the alteration of issues by the ALJs that we will not consider because they were argued for the first time on appeal.  *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004).

claims that arose before April 16, 2007, because they were outside the two-year statute of limitations, and the parents did not allege any exception to the statute. The district court agreed that the claims were time barred despite the parents' contentions that an exception to the statute applied.

The statute of limitations for due process complaints in California precludes claims that occurred more than two years prior to the date of filing the request for due process. Cal. Educ. Code § 56505(l); 20 U.S.C. § 1415(f)(3)(c). The statute does not apply where "the parent was prevented from requesting the due process hearing due to either of the following: (1) Specific misrepresentations by the local educational agency that it had solved the problem forming the basis of the due process hearing request. (2) The withholding of information by the local educational agency from the parent that was required under this part to be provided to the parent." Cal. Educ. Code § 56505(l).

First, the parents argue that the District withheld from them a procedural safeguards notice, which the District was required by 34 C.F.R. § 300.504 to make available to them, at the latest, upon the referral for C.M.'s initial evaluation on February 20, 2007. The parents claim they did not receive such a notice until the first IEP meeting on April 18, 2007. However, the district court correctly determined that the record reveals otherwise. IST Jones testified that on February 20, 2007, "[a]long with the assessment plan, [E.M.] would have been given a copy of her parents' procedural safeguards." Although Jones did not have a "present recollection" of giving E.M. that exact document, the ALJ found Jones's testimony credible under Federal Rule of Evidence 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that

on a particular occasion the person or organization acted in accordance with the habit or routine practice."). The ALJ found Jones more credible than E.M. on what documents were received when they met, and it was not erroneous for the district court to defer to the ALJ's credibility finding where the decision was thorough and careful. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996) (where findings are based on determinations regarding the credibility of witnesses, even greater deference is due the trial court's findings); *R.B.,* 496 F.3d at 942 (the amount of deference accorded the hearing officer's findings increase where the officer is "thorough and careful"). Moreover, Jones's testimony is corroborated by the testimony of Principal Maddux and Dr. Sassone, as well as the Assessment Plan that E.M. signed on February 20, 2007:

> You are being supplied a written statement of Parent Rights which summarizes the laws that apply to Special Education and describes the process for resolving possible disputes through local mediation, alternative dispute resolution services and/or a hearing conducted by persons authorized by the State Department of Education. . . . If you have any questions regarding this letter or your rights as a parent, please contact your child's teacher, the school principal, or Jane Jones at 283-6231.

Second, the parents argue that the statute does not apply because the District withheld C.M.'s RTI data. Although we have concluded that the District procedurally violated the IDEA by withholding C.M.'s RTI data, we find that the procedural violation occurred at the earliest as of February

20, 2007, when the District sought to obtain the parents' informed consent for C.M.'s initial evaluation. The parents fail to demonstrate how receipt of the RTI data, and for that matter the notice of procedural safeguards, in February rather than April would have caused them to file the due process complaint earlier. We therefore conclude that the district court did not err in deciding that the claims that arose before April 16, 2007, were time barred.

IV

The district court properly dismissed the parents' claims against the Department of Education. In the first two lawsuits, the parents brought claims against the Department of Education for failing to properly oversee the OAH proceedings and for staying its investigation. In the second lawsuit, the parents' first amended complaint also included claims against the Department of Education under the IDEA. The district court dismissed all claims against the Department of Education in both cases in its June 2, 2010, and March 3, 2011, orders.

The parents argue they can state a claim against the Department of Education for "breach of their duty to ensure IDEA procedural safeguards and fundamental fairness in OAH hearings." The parents dispute the ALJs' alteration of issues and barring of certain witness testimony. However, the district court determined that the Department of Education has no authority over the OAH, and that determination was affirmed by this Court and will not be reviewed again. *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1092 (9th Cir. 2012) ("[The Department of Education] does not have authority or responsibility to directly supervise or review each decision made by an ALJ in a due process hearing.").

The parents argue they can state a claim against the Department of Education for staying its investigation because the IDEA provides them a private right of action. However, the district court correctly dismissed this claim because the Department of Education abided by the regulatory mandate to stay the investigation while the due process hearing was pending. 34 C.F.R. § 300.152(c)(1) ("If a written complaint is received that is also the subject of a due process hearing . . . the State must set aside any part of the complaint that is being addressed in the due process hearing until the conclusion of the hearing."). The parents argue the issues in the complaint and due process hearing were not the same because they raised the District's delay in seeking due process after the Department of Education investigation was closed. But this is without merit. The due process hearing was focused on the parents' request for an IEE and whether the District was responsible for funding it. That question necessarily depended on the District's compliance with the IDEA in responding to the parents' request.[7]

The parents argue that they can state a claim against the Department of Education for breach of its duties under §§ 1412(a) and 1415(a) of the IDEA. However, the district court correctly determined that those provisions do not provide a private right of action. Section 1412 discusses the policies and procedures that a state is required to have in place in order for the state to be eligible for assistance under the IDEA, and § 1415 is a mandate for a state to establish procedural safeguards. Neither section contains a private

---

[7] The parents also raise a new argument that the Department of Education was required to address corrective action before closing the investigation. However, this new argument will not be reviewed for the first time on appeal. *Cold Mountain*, 375 F.3d at 891.

right of action, and indeed § 1415(f) specifically requires complaints to be heard in an impartial due process hearing and then provides an express right of appeal for review of any administrative decision.[8]  Thus, the district court did not err in dismissing all claims against the Department of Education.

V

The district court properly dismissed the parents' retaliation claims under § 504 of the Rehabilitation Act pertaining to (1) the District's request to stay the Department of Education's investigation of the parents' complaint; and (2) the District's use of facilitated IEP meetings.  However, the district court erred by not explicitly addressing the parents' retaliation claim pertaining to the District's effort to reevaluate C.M. after the parents' IEE request.

The parents fail to brief the stayed Department of Education investigation theory, and it is therefore waived.[9] *United States v. Williamson*, 439 F.3d 1125, 1137–38 (9th Cir. 2006) (issues raised in brief but not supported by argument are abandoned); Fed. R. App. P. 28(a)(9)(A).  We address the remaining two claims in turn.

---

[8] The parents claim that the *Cannon v. University of Chicago*, 441 U.S. 677, 688 n.9 (1979), factors for determining whether to imply a private right of action come out in their favor, but they offer only a partial argument in their brief and fail to discuss the dispositive factor of whether Congress intended to create a private right of action. *See Greene v. Sprint Commc'ns Co.*, 340 F.3d 1047, 1052 (9th Cir. 2003).  Therefore, we decline to reach whether a private right of action can be implied in §§ 1412 and 1415 of the IDEA.

[9] Likewise, we do not address number 14 and number 26 of the parents' questions presented for failure to brief the arguments.

A

Prior to its final order, the district court dismissed the parents' § 504 retaliation claim that the District used the facilitated IEP meetings coercively because the parents failed to exhaust the issue at the administrative hearing. The parents contend the dismissal was in error.

Under *Robb v. Bethel School District*, 308 F.3d 1047, 1048 (9th Cir. 2002), *overruled by Payne v. Penninsula School District*, 653 F.3d 863 (9th Cir. 2011) (overruled on other grounds by *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014)), the district court dismissed the claim for failure to exhaust because that case stood for the proposition that where a "plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies[,] . . . exhaustion of those remedies is required." *Accord* 20 U.S.C. § 1415(l). The parents argue that the court erred because exhaustion is not needed for this claim and bases their argument on *Payne*. In that case, we clarified that the IDEA's exhaustion provision applies only in cases where the relief sought is available under the IDEA. *Payne*, 653 F.3d at 871. Thus, the parents go on to conclusively claim, "Educational services available through the IDEA's administrative process could not remedy the effect of facilitated IEP team meetings. However, remedies are available under § 504."

However, we have clarified *Payne* and explained that to determine what constitutes a claim for relief under the IDEA, we "consider whether a plaintiff seeks (1) monetary relief as the 'functional equivalent' of a remedy available under the IDEA, (2) 'prospective injunctive relief to alter an IEP or the educational placement of a disabled student,' or (3) 'to

enforce rights that arise as a result of a denial' of a FAPE."
*C.O. v. Portland Pub. Schs.*, 679 F.3d 1162, 1168 (9th Cir.
2012) (quoting *Payne*, 653 F.3d at 875). Here, the parents'
retaliation claim is the functional equivalent of a procedural
defect claim under the IDEA where they claim violation of
§ 1414(d)(1)(B)(iv) concerning the individuals that comprise
an IEP team. Their claim for relief thus falls under the IDEA,
and they are bound by its exhaustion requirement. The
district court did not err in dismissing the claim for failure to
exhaust.

## B

The parents argue that the district court erred because it
"did not resolve or address the [reevaluation] retaliation
claim." Indeed, the district court dismissed the facilitated IEP
meetings claim and the stayed Department of Education
investigation claim but not the reevaluation claim. Although
the district court granted the District's motion for summary
judgment, which included the question whether the District
had any ill motive in requesting the reevaluation, we agree
that the district court erred by not explicitly addressing their
§ 504 claim. Additionally, the parents assert that
"[d]iscovery was still pending on CM's retaliation claims"
when the district court issued its final order. We therefore
remand the issue to the district court for it to consider the
claim in the first instance.

## VI

Under 20 U.S.C. § 1415(i)(3)(B), the parents sought
attorneys' fees at the district court for prevailing on the IEE
reimbursement issue—the parents were awarded $2400 in the
first OAH proceeding for the cost of the IEE and $800 in the

second lawsuit for the fee Dr. Guterman charged to attend the March 2009 IEP meeting. Ultimately, the district court reduced the parents' attorneys' fees award based on their limited degree of success and for unreasonably protracting the final resolution of the controversy. In light of our reversal as to C.M.'s FAPE, we remand this issue for reconsideration by the district court.

## VII

In conclusion, we reverse the district court's determination that the District did not procedurally violate the IDEA by failing to provide the parents with his complete RTI assessment data and that the District provided C.M. with a FAPE. We remand for reconsideration of both the reimbursement due the parents for his private instruction and their attorneys' fees award, and we remand for consideration of the parents' § 504 reevaluation retaliation claim. We otherwise affirm the judgment of the district court. Each party shall bear its or their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding that the Lafayette School District failed to provide M.M. a Free Appropriate Public Education, and from the reversal of the award of attorney's fees. Giving appropriate deference to the findings of the state Administrative Law Judge (ALJ), I conclude that no procedural violation of the Individuals with

Disabilities Education Act (IDEA) was committed by the School District. Neither do I agree that the district court failed to address Plaintiffs's claim brought pursuant to Section 504 of the Rehabilitation Act.

My disagreement with the majority primarily stems from our differing view of the Response-to-Intervention (RTI) model utilized by the School District to measure achievement levels of all students in the school. It is undisputed that these assessment tools were administered to all students to identify those who might benefit from extra assistance, and were NOT a mechanism used to identify students in need of special education. Nevertheless, the majority holds that failure to provide these test results to C.M.'s parents resulted in a violation of the IDEA.

The ALJ explored this matter in detail following an eleven-day hearing in which he actively participated. We have consistently recognized the expertise of administrative judges who routinely preside over hearings addressing the adequacy of special education plans adopted and administered by local school districts. The decisions of these specialized judges are entitled to substantial deference. In *J.W. v. Fresno Unified School Dist.*, 626 F.3d 431, 438 (9th Cir. 2010), we reminded ourselves that we must not substitute our "own notions of sound educational policy for those of the school authorities" when considering cases under the IDEA (citation omitted). We specifically noted that increased deference is afforded the decision of a hearing officer when his findings "are thorough and careful." *Id*. (citation omitted). We generally consider findings to be "thorough and careful" when the hearing officer participates in questioning witnesses, and pens a decision containing a complete recitation of the facts and a comprehensive analysis of the

issues. *Id*. at 40–41 (citation omitted); *see also J.M. v. Capistrano Unified Sch. Dist*., 556 F.3d 900, 908 (9th Cir. 2009), *as amended* (determining that a twenty-page opinion met the standard of "thorough and careful"). The ALJ's decision easily meets these criteria.

In a comprehensive, detailed, forty-eight page decision, the ALJ rejected the claim that the School District was required to incorporate the RTI documents as part of the assessment process to determine C.M.'s eligibility for special education services. *See ALJ Decision*, p. 18. The ALJ described credible testimony from the principal at C.M.'s school, who explained that the school's RTI program is primarily used to assign students to teachers based on achievement level. *See id*. at p. 5. At the beginning of each school year, every student is administered a battery of screening assessments. From these assessments, a card is prepared for each student listing the student's grade level, test scores, biographical information, screening results, and classroom observations. *See id*. The purpose of this RTI model "is to provide early and effective intervention to students requiring additional support. . . ." *Id*. During the month of October, the school held assessment sessions for each grade level. During these assessment sessions students were placed into one of three categories: Intensive (those students performing well below grade level), Strategic (those students performing within the grade level curriculum range, but in need of additional support), and Benchmark (those students performing at or above grade level). *See id*. at pp. 5–6. Classes are then "comprised of a blend of students from each category." *Id*. at p. 5.

From this description, it is apparent that the RTI assessments were for the purpose of determining the makeup

of the classrooms rather than assessing any child for eligibility for special education services. Indeed, the RTI assessment is part and parcel of the School District's general education system. *See id*. at p. 6. These assessments took place three times each school year to monitor the educational progress of all students, not just those in need of special education. *See id*. It was only after concerns were raised regarding C.M.'s lack of academic progress in the area of language arts that C.M. was referred for testing to determine his eligibility for special education services. *See id*. at p. 9.

The ALJ made a clear distinction between use of the RTI as a means to assign students to their respective classrooms and use of the RTI as an assessment tool to determine eligibility for special education services. The ALJ explained that school districts have the option of using an RTI model to determine eligibility for special education services, or using a "student's ability versus student's actual achievement discrepancy model." *Id*. at p. 19 and n.10. The ALJ noted that it was undisputed that the Lafayette School District used the "ability to achievement discrepancy model" to determine C.M.'s eligibility for special education services. *Id*. n.10. The record supports this determination. As the majority acknowledges, RTI assessments are based on the Slosson Oral Reading Test and the Dynamic Indicators of Basic Early Literacy Skills Test. *See Majority Opinion*, p. 6. However, the assessment used to determine C.M.'s eligibility for special education services were the Woodcock Johnson III reading comprehension test and the Comprehensive Test of Phonological Processing. C.M.'s Eligibility Summary form documenting his eligibility for special education services did NOT list the RTI in the assessments used to make the determination of eligibility or to corroborate the determination of eligibility.

Rather than deferring to the ALJ's considered resolution of this issue, the majority embarks upon a *de novo* review of the record to reach a conclusion contrary to that of the ALJ and at odds with the record.

As the district court noted, Plaintiffs' reliance on 20 U.S.C. § 1414(c) is misplaced. That statute provides in pertinent part:

> Additional requirements for evaluation and reevaluations
>
> (1) Review of existing evaluation data
>
> As part of an initial evaluation (*if appropriate*) and as part of any reevaluation under this section, the [Individualized Education Program] Team and other qualified professionals, *as appropriate*, shall–
>
> (A) review existing data on the child . . .

20 U.S.C. § 1414(c)(1)(A) )(emphasis added).

It is important that this provision is tethered to the evaluation and assessments conducted by the team responsible for determining the student's eligibility for special education services. Because the record reflects that the RTI assessments were not used to determine C.M.'s eligibility for special education services, this provision does not support the majority's conclusion that the School District was required to provide the RTI data to C.M.'s parents under the IDEA, especially considering that the statutory language is tempered by inclusion of the phrase "if appropriate,"

thereby reflecting deference to the discretion of the school officials. *See Our Children's Earth Found. v. United States EPA*, 527 F.3d 842, 851 (9th Cir. 2008) (noting that use of "if appropriate" in the statute signifies a grant of discretion); *see also United States v. Godinez-Ortiz*, 563 F.3d 1022, 1029 (9th Cir. 2009) (recognizing that because the governing statute provided for a hearing, "if appropriate," the hearing might never occur); *K.D. v. Hawaii Dept. of Educ*., 665 F.3d 1110, 1119 (9th Cir. 2011) (describing "if appropriate" as a "qualifier"). This same discretionary language vested the Lafayette School District with discretion to determine which assessment should be administered and, correspondingly, which data should be reviewed in evaluating C.M. for special education services. Exercising its statutory discretion, the School District elected NOT to use the RTI as an assessment model. Consequently, no legal obligation arose to review or provide the RTI data in conjunction with the evaluation of C.M.'s eligibility for special education services.

Plaintiffs' argument fares no better under the provisions of § 1414(b), which requires the educational agency to notify the parents of the description of evaluation procedures the educational agency "proposes to conduct." Because the School District did not propose to utilize the RTI model to evaluate C.M.'s eligibility for special education services, this provision did not mandate notification of the RTI data. In sum, the majority's conclusion that the School District relied upon the RTI data and was required to provide that data to C.M.'s parents as part of the IDEA procedural requirements ignores the factual findings made by the ALJ and the district court, and deviates from the language of the IDEA.

I also disagree that the district court failed to explicitly address Plaintiffs' claim under the Rehabilitation Act. This

claim was encompassed within Plaintiffs' assertion that the school district's motives for seeking a reevaluation of C.M. were vindictive. The district court explicitly addressed this claim under a section titled "Whether the District Unlawfully Retaliated by filing a Due Process Complaint." *District Court Opinion*, p. 45. The district court restated Plaintiffs' contention that "the District engaged in retaliatory behavior against plaintiffs in violation of § 504 of the Rehabilitation Act to intimidate, punish, and discourage Plaintiffs from asserting their rights. . . ." *Id.* (internal quotation marks omitted). The district court referenced the finding from the ALJ that the due process complaint filed by the school district did not influence the decision of the California Department of Education (CDE) to dismiss Plaintiffs' compliance complaint. Rather, the CDE dismissed Plaintiffs' Complaint "on its own volition." *Id.* Accordingly, the ALJ determined that C.M. offered insufficient evidence of retaliation. *See id.*

The district court agreed with the ALJ's analysis of the § 504 issue, and added that this issue had been previously addressed in the court's order resolving Defendants' Motion to Dismiss. The court explained that the issue was addressed as to the CDE in its order addressing the motion to dismiss. However, the court held that the "same reasoning holds true for the District." *Id.* at p. 46. The school district acted in compliance with the governing regulation, which negated a retaliatory motive. *See id.* Rather than failing to address the § 504 issue, the district court actually addressed it twice. The Plaintiffs' contrary allegation lacks merit.

Cases brought under the IDEA are complicated, and emotions sometimes run high. It is completely understandable that the parents of a child with a disability would leave no stone unturned in their effort to ensure that

their child's legal rights are fully protected.  However, in this case, I agree with the ALJ and the district court judge that the Lafayette School District complied with the requirements of the IDEA.  I would affirm the district court judgment in its entirety.